..c Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4144 | **DATE** | 12/22/2004 |
| **CASE TITLE** | Redmond vs. Refco Group Ltd., LLC/Refco, LLC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, defendant's motion for summary judgment [12-1] is granted. Judgment is entered in favor of the defendant and against the plaintiff. All future dates are stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/22/2004 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TRACEY A. REDMOND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 03 C 4144 |
| v. ) | Judge Joan H. Lefkow |
| ) | |
| REFCO GROUP LTD., LLC/ ) | |
| REFCO, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Tracey A. Redmond ("Redmond"), has filed a one-count Complaint against defendant, Refco Group Ltd., LLC, also doing business as Refco, LLC ("Refco"), alleging that Refco violated the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12102 *et. seq.*, by failing to accommodate Redmond's severe depression and by terminating Redmond because of his depression. Before the court is Refco's motion for summary judgment. For the reasons stated below, the court grants the motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving

party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Refco provides financial services to individuals and institutional clients internationally. These services include the execution and clearing of futures and options on regulated domestic and international markets, as well as prime brokerage of inter-bank foreign exchange, U.S. Treasury Securities, non-ferrous metals, precious metals, non-dollar securities and equities. (Def. L.R. 56.1 ¶ 3.) Redmond formerly worked as a broker for Refco, in its Lind Plus division, in Chicago, Illinois.[1] The Lind Plus division executes futures and futures options products geared toward retail investors. (*Id.* ¶ 4.) As a Lind Plus broker, Redmond worked with a group of retail futures investors and was responsible for trade strategy development, market analysis, account order placement, margining, distribution of market research, and resolution of client inquiries. (*Id.* ¶ 6.)

---

[1] Redmond began working for the Lind-Waldock & Company in 1986. Lind-Waldock terminated Redmond's employment in approximately December 1990. In 1993, Lind-Waldock rehired Redmond. Redmond began working as a broker for its Lind Plus division in March 1998. In February 2000, Refco acquired Lind-Waldock & Company and converted it into Lind-Waldock & Company, LLC. In September 2001, Lind-Waldock & Company, LLC was merged into Refco, LLC, an affiliated subsidiary of Refco Group Ltd., LLC. Lind-Waldock is now a division of Refco, LLC. (*Id.* ¶ 5.)

2

Refco's employment policies are detailed in Refco's Employee Handbook ("Handbook"). The Handbook contains a section entitled "Attendance Requirements." That section provides in part the following:

> REFCO recognizes that some absences are unavoidable and has adopted leave provisions to accommodate those needs. Each of us must insure that those leave policies are followed and that they are not abused. Excessive absences (including lengthy or excessive periods away from work), lateness or a pattern of poor attendance, regardless of the reason or justification, may result in discipline, up to and including termination.

(*Id.* ¶ 8.) The Handbook also contains a section detailing Refco's Family and Medical Leave of Absence policy. The section states in part the following:

> With few exceptions, Refco will restore you to your former position or to an equivalent one with equivalent pay, benefits, and other employment terms, provided you return to work at the end of your scheduled leave. If you decide not to return, your benefits will be discontinued . . . . REFCO will not interfere with or restrain any employee in the exercise of [Family Medical Leave Act] rights; nor will it retaliate or discriminate against anyone who seeks to enforce these rights.

(Def. Ex. 3, at 21-22.)

Between November 1998 and July 2001, Redmond received the following written or oral warnings from Refco regarding his job performance:

> a. On or about November 24, 1998, Redmond received a warning for violating Refco's margin policy. (Pl. Resp. ¶ 10(a).)
>
> b. On or about May 7, 1999, Redmond received a warning for arguing with an operation manager. Redmond protested the warning, noting that the office manager had "past problems" with mistreating Redmond. (*Id.* ¶ 10(b).)
>
> c. On or about November 6, 2000, Jim Gombas ("Gombas"), Redmond's immediate supervisor, met with Redmond and explained that his performance was deficient in five different areas and that "significant progress needed to occur within 30 days to ensure continued employment." In his November 14, 2000 memorialization of that meeting, Gombus noted that Redmond "had demonstrated successful production levels in the past." (*Id.* ¶ 10(c).)

3

According to Redmond, Refco instituted policy changes in 2001 that allegedly changed Lind Plus from a service-oriented brokerage division to a sales-oriented brokerage division. Redmond admits that these changes applied to all brokers. Redmond claims that these changes made it too stressful for him to continue performing his job, and that the changes caused him to suffer depression. (Def. L.R. 56.1 ¶ 11.) On July 12, 2001, Gombas gave Redmond a written warning for allegedly failing to follow proper protocol with respect to the handling of certain trades. Specifically, Gombas claims that Redmond had conducted a trade on an account that lacked sufficient funds without first obtaining Gombas' approval. (Gombas Decl. ¶ 9.) Redmond asserts that this warning "was really like the straw that broke the camel's back. It pushed me. I was already out on the edge and that was like the thing that pushed me over." (Def. L.R. 56.1 ¶ 12.) Redmond worked the following day, July 13, 2001, and then began a leave of absence for alleged anxiety and depression. (*Id.* ¶ 13.)

Shortly after Redmond's last day of work, Refco preliminarily designated his leave under the Family Medical Leave Act ("FMLA"), effective as of July 13, 2001. Redmond subsequently filed the necessary FMLA paperwork and provided a certificate from his primary care physician, Dr. Iboni Dokubo. Consequently, on August 10, 2001, Refco sent Redmond a letter confirming that his leave had been officially designated under the FMLA and could last "for a maximum of 12 weeks, or up to October 5, 2001." (*Id.* ¶ 14.) Redmond took the full twelve weeks of FMLA leave permitted by statute. Throughout this period, Redmond received short-term disability payments from Refco. (*Id.* ¶ 15.)

In 2001, including the period of Redmond's leave of absence, Refco underwent substantial growth. During Redmond's leave of absence, Gombas hired Mike Florez ("Florez")

4

on or about August 15, 2001, to service Redmond's accounts. At that time, Gomas explained to Florez that his assignment on those accounts might only be temporary in length, because it was unclear when Redmond would be returning to work. When Redmond was terminated over five months later, Florez permanently took over Redmond's accounts. (*Id.* ¶ 16.)

When Redmond's FMLA leave expired on October 5, 2001, Redmond did not return to work or contact anyone at Refco. Refco did not terminate Redmond at this time, however. Instead, on October 25, 2001, Jamie Levy ("Levy"), an employee in Refco's Insurance and Benefits Department, sent Redmond a letter reminding him that his leave had expired, that he had subsequently missed fourteen days of work, and that Refco would assume he had resigned unless he contacted Levy within two business days after receiving the letter. (*Id.* ¶ 17.)

On October 28, 2001, Redmond contacted Gombas by telephone. Redmond stated that his health status had not changed and informed Gombas about the letter Redmond had received from Levy. Redmond also asked Gombas how he "could put together a strategy with coming back into the workplace." Gombas informed Redmond that he would need to contact Levy about the issue. (Pl. Add'l Facts ¶ 69.) Redmond claims that he wanted to arrange an accommodation with Refco that would allow him to return to work, such as a continuation of insurance, return to a five-day work week, and permission to see his therapist two days a week. (*Id.* ¶ 70.) The following day, October 29, 2001, Redmond contacted Levy by telephone. Levy asked Redmond if he was able to return to work. Redmond informed Levy that he was unable to return and had scheduled an appointment with a doctor the following day.[2] Levy asked Redmond how long he felt he would

---

[2] In his response to Refco's Statement of Facts, Redmond denies that he told Levy that he had scheduled an appointment the following day, citing to his deposition testimony in support of the denial. (Pl. Resp. ¶ 18.)

(continued...)

5

be unable to work. Redmond responded that he needed to consult a doctor, but, in his own opinion, "he might be able to come back in another 3-6 months possibly." (Def. L.R. 56.1 ¶ 18.) Following the October 29, 2001 conversation, Redmond sent a letter to Levy "to confirm that I am not able to return to work. My medical doctor has not released me. I have been referred to a psychiatrist." (Def. L.R. 56.1 ¶ 20.)

On November 1, 2001, Levy sent Redmond a letter noting that he had missed nineteen days of work since his FMLA leave had expired. She further wrote, "We need to fill your position, and as a result request that you supply us with a doctor's note certifying: (1) your condition; (2) your prognosis; and (3) your anticipated return date. If we do not receive the requested information by Wednesday, November 7, 2001, we will assume you are voluntarily resigning from your position." (*Id.* ¶ 21.) On November 7, 2001, Redmond faxed a letter to Levy stating that he was not resigning. He stated that he was still under his doctor's care and had been referred to Dr. Dennison, a psychiatrist, but that his November 6 appointment with Dr. Dennison had been rescheduled for November 14, 2001. The fax provided contact information for Dr. Dennison's office. (Def. Ex. 12.) Redmond called Levy later the same day and informed her that he did not have a letter from a physician indicating that he could not return to work and that he had not been evaluated by a psychiatrist while he had been on FMLA leave. He again informed Levy that he had an appointment scheduled for November 14, 2001. (Def. L.R. 56.1 ¶ 23.)

Refco did not terminate Redmond at this point. Instead, Levy sent Redmond another letter stating, "We need you to return to work as soon as possible or we need to fill your

---

²(...continued)
Redmond's deposition testimony does not support the denial. (Redmond Dep., at 133.) Thus, the court deems the fact admitted.

position." She requested that Redmond call her directly after his November 14 appointment with a psychiatrist to specify when he could return to work. The letter added, "If you are unable to return to work after your doctor's appointment, please provide us with a doctor's note certifying (1) your condition; (2) your prognosis; and (3) your anticipated return date." (*Id.* ¶ 24.)

On November 14, 2001, Dr. Sylvia Dennison ("Dennison") evaluated Redmond. After that evaluation, Dennison wrote a note and gave it to Redmond, who in turn faxed it to Levy the following day. Dennison's note stated, in full

> I did meet with Mr. Tracey Redmond this date. We are scheduled to meet again on the morning of November 16. He is not able to return to work at this time. I will have a better idea of prognosis and recommendation after our meeting in two days.

(Def. Ex. 15.)

Dennison evaluated Redmond again on November 16, 2001. Her treatment notes identify two "problems, "depression" and "job difficulties." The notes identify "goals" and "objectives" for each of these problems. The "goal" for the problem of depression is specified as "normalization of affect." The "objectives" for this problem are specified as "patient will demonstrate improved ability to interact w/ others" and "[patient] will experience decreased hopelessness." The "goal" for the problem of job difficulties is specified as "resolution of conflict over return to work." The "objective" for this problem is "[patient] will decide whether/not to return to current employment." (Def. Ex. 16.) Dennison also filled out the physician's portion of Redmond's application for long-term disability benefits. Dennison noted that Redmond's progress remained "unchanged." With respect to Redmond's anticipated return to work, Dennison did not specify a particular date, stating only "Not less than additional 8W." (Def. L.R. 56.1 ¶ 27.)

7

Redmond and Refco also filled out portions of the application for long-term disability benefits. Ellen Brooks, Refco's Director of Insurance and Benefits, filled out the "Employer's Statement" of the form on Refco's behalf and indicated that Redmond's return to work date was "unknown." On Redmond's portion of the application, he answered written questions about his anticipated return to work date by inserting question marks. Redmond explained, "I didn't know when I would be able to return to work and in what capacity." Redmond ultimately received long-term disability benefits from approximately November 2001 until May 2002. (*Id.* ¶ 28.)

After Redmond submitted his application for long-term disability benefits in approximately November 2001, he never provided Refco with any further updates or information about his medical condition, prognosis or anticipated return to work date, nor did any of his physicians or psychiatrists provide Refco with any further information about Redmond's medical status or potential to return to work. (*Id.* ¶ 30.)

On or about November 29, 2001, Redmond again met with Dennison and informed her about his anxiety regarding returning to work at Refco, including sleeplessness, headaches, chest pains, sweaty hands, and general nervousness he felt when he was near Refco's offices. Dennison referred Redmond to Dr. Paul Harris ("Harris"), another psychiatrist, for further treatment. (*Id.* ¶ 29.)

On December 13, 2001, Redmond began a series of psychotherapy sessions with Harris. At the first meeting, Harris prescribed Setraline (commercially known as Zoloft) for Redmond's depression. At a second psychotherapy session on January 7, 2002, Redmond told Harris that he had not noticed any changes in his condition. Harris increased the prescribed dosage of Setraline. (*Id.* ¶ 31, 33 and Def. Resp.)

8

On January 17, 2002, Levy sent Redmond a letter terminating his employment. In the letter, Levy noted that after Redmond's FMLA leave expired on October 5, 2001, Refco had made "several attempts to obtain information from you regarding your return to work date. After much prodding, we finally received an incomplete and inconclusive letter from your doctor, which did not indicate an anticipated return date. The last time we heard from your doctor was on November 14, 2001. As a result, we were forced to permanently fill your position." (*Id.* ¶ 35.) Redmond called Levy after he received the termination letter. Levy explained to him that Refco had decided to fill his position. Redmond responded that he was unable to return to work on the date of his termination because he had not been released by his doctors. (*Id.* ¶ 36-37.) At no time after Redmond began his FMLA leave did any physician or psychiatrist release him to work for Refco. (*Id.* ¶ 38.)

On January 24, 2002, one week after his termination by Refco, Redmond filed a charge with the Equal Employment Opportunity Commission ("EEOC"). The EEOC charge alleges, "I believe that if I did not have my disabilities, I would not have been terminated." The EEOC charge does not include any allegation that Refco failed to accommodate Redmond's disability, nor does it assert that Redmond ever asked Refco for any accommodation. (Ex. 32.)

## DISCUSSION

Redmond's Complaint alleges that Refco violated the ADA by failing to accommodate his depression and by terminating him because of his depression.

### A. Failure to Accommodate

A plaintiff alleging employment discrimination may not raise a claim in a lawsuit unless it was first included in a Charge of Discrimination with the EEOC. *Alexander* v. *Gardner-Denver*

9

*Co.*, 415 U.S. 36, 47 (1974); *Long v. Chicago Transit Auth.*, 985 F.Supp. 836, 840 (N.D. Ill. 1997)("The general rule is that [a plaintiff] may not bring claims under the ADA that were not included in the charges made to the EEOC."). The Seventh Circuit has held that a failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA. Thus, to bring a failure to accommodate claim, an ADA plaintiff must have included that claim in his or her EEOC charge. *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999)(A failure to accommodate claim and a claim of discriminatory treatment under the ADA "are analyzed differently under the law. Therefore, they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability."); *see also Terry v. American Airlines, Inc.*, No. 02 C 8829, 2004 WL 2211606, at *13 (N.D. Ill. Sept. 30, 2004)("As for Plaintiff's suggestion that [defendant] failed to accommodate his disability, that claim was not raised in his EEOC charge and is barred."); *Chambers v. Wildman, Harrold, Allen & Dixon*, No. 97 C 5715, 1997 WL 666507, at *4 (N.D. Ill. Oct. 23, 1997) ("Even with a cognizable disability, plaintiff's claim of failure to provide a reasonable accommodation would fail because it is not 'like or reasonably related' to the termination claims made in the EEOC charge."). Here, Redmond did not raise a claim of failure to accommodate, nor even mention that he sought accommodation, in his EEOC charge. Thus, Redmond's failure to accommodate claim is barred.

**B. Discriminatory Termination**

Redmond has presented no direct evidence that he was terminated because of his depression. Thus, he must proceed under the indirect burden-shifting method of proof established by *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). *See DeLuca* v.

10

*Winer Indus.*, 53 F.3d 793, 797 (7th Cir.1995) (applying the *McDonnell-Douglas* method to ADA cases). Under this method, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) he has suffered an adverse employment decision because of his disability. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002). If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Buie*, 366 F.3d at 503. If the defendant meets the burden, the plaintiff must prove, by a preponderance of the evidence, that the defendant's proffered reasons were a pretext for intentional discrimination. *Id.*

Here, the court need not decide whether Redmond has established a *prima facie* case, because Redmond has produced no evidence that Refco's articulated reason for terminating him was a pretext for discrimination. *See Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) ("When the defendant has proffered an explanation for termination that the court determines to be non-pretextual, the court may avoid deciding whether the plaintiff has met his *prima facie* case and instead decide to dismiss the claim because there is no showing of pretext."). Refco terminated Redmond's employment only after Redmond was unable to attend work for more than six consecutive months. Refco gave Redmond numerous opportunities to provide information about his condition and anticipated return date. When Redmond repeatedly failed to satisfy those requests, Refco terminated him, citing the need to permanently fill his position. This is a legitimate nondiscriminatory reason for the termination. The ADA does not

11

insulate employees from being terminated because of a prolonged absence due to illness. *Waggoner* v. *Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999) ("The ADA protects an important, but finite, universe of people. . . . The Act does not protect people, for instance, from being fired because of illness."); *see also Byrne* v. *Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003), *cert. denied*, 124 S.Ct. 327 (2003) ("Inability to work for a multi-month period removes a person from the class protected by the ADA."). Nor does the ADA require an employer to grant an employee an indefinite leave of absence. *Corder* v. *Lucent Tech., Inc.*, 162 F.3d 924, 928 (7th Cir. 1998); *Rumley* v. *Wahl Clipper*, No. 00 C 50366, 2003 WL 262518, at *2 (N.D. Ill. Feb. 7, 2003)("An employer is not required to keep a job open indefinitely.").

Redmond has failed to present *any* evidence that Refco's articulated reason for terminating him was a pretext for discrimination. Redmond only argues that Refco's "failure to provide reasonable accommodations" signals pretext. As explained above, however, Redmond cannot bring a claim for failure to accommodate because he did not include this claim in his EEOC charge. It follows that Redmond cannot bring this claim through the "back door" by styling it as a pretext argument.

Because Redmond has not demonstrated that the reason Refco gives for firing him was pretext, there is no genuine issue of material fact that the reason Refco fired him was what Refco said it was, a failure to return to work after several requests and the need to fill the position with a person who was able to perform the job.

## ORDER

For the reason stated, the motion for summary judgment is granted. This case is terminated and all pending dates are stricken.

ENTER:

_____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: December 21, 2004